## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COGENT INFRASTRUCTURE, LLC,
Formerly known as COGENT
INFRASTRUCTURE, INC.,

      Plaintiff,

  v.

SPRINT LLC and SPRINT
COMMUNICATIONS LLC,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2025-0486-PRW

Submitted: May 26, 2026
Decided: August 11, 2026

*Upon Defendant Sprint's Motion to Dismiss*,
**GRANTED in part, DENIED in part**.

### MEMORANDUM OPINION AND ORDER

Elisabeth S. Bradley, Esquire, James P. Hughes, Jr., Esquire, Jason W. Rigby, Esquire, Alyssa T. Atkisson McKeever, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, John Patrick Sherry, Esquire (*argued*), William T. DeVinney, Esquire, JPS LAW PLLC, Vienna, Virginia, *Attorneys for Plaintiff Cogent Infrastructure, LLC.*

Peter H. Kyle, Esquire, Michael A. Carbonara, Jr., Esquire, DLA PIPER LLP, Wilmington, Delaware, Melanie E. Walker, Esquire (*argued*), Colin Fitzgerald McGrath, Esquire, DLA PIPER LLP, Los Angeles, California, *Attorneys for Defendants Sprint LLC and Sprint Communications LLC.*

**WALLACE, J.**

What began as Cogent Infrastructure, LLC's acquisition of Sprint's[1] long-haul fiber network has evolved into a dispute over whether the transaction's economic burdens were presented with the same clarity before closing as they were asserted afterward. Cogent contends that Sprint characterized key fiber-related obligations in a manner that reduced their apparent cost, only to adopt a different position when the final purchase price was determined. That disagreement may proceed as a matter of contract, but Cogent may not elevate the same alleged wrong into a separate claim for fraud.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

In September 2022, Cogent entered into a Membership Interest Purchase Agreement ("MIPA") with Sprint to acquire Sprint's United States long-haul fiber optic network.[3] The network included both fiber owned by Sprint and fiber used pursuant to third-party contractual arrangements.[4] The stated base purchase price was $1, with the final consideration to be determined through a post-closing

---

[1] The parties refer to Sprint in the singular, rather than distinguishing between Sprint LLC and Sprint Communications LLC. Because the distinction between the two is immaterial to resolving the current dispute, the Court does the same.

[2] For the purpose of analyzing this motion to dismiss, the following facts are drawn from the Plaintiff's Amended Complaint. *See Windsor I, LLC v. CW Capital Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020) ("In most cases, when the [ ] Court considers a 12(b)(6) motion, it limits analysis to the 'universe of facts' within the complaint and any attached documents.").

[3] Amend. Compl. ¶ 2 (D.I 22).

[4] *Id*.

purchase price adjustment.[5] For the purposes of this suit, the most significant adjustment had to do with leased property.[6] Under the MIPA, Sprint agreed to a price adjustment for 50% of short-term operating lease obligations associated with the acquired wireless business (the "Short-Term Operating Lease Amount" or "STOL").[7] Put simply, any leased property came with a substantial discount.

The largest reoccurring liability of the purchased business arose from a System Use and Service Agreement ("SUSA") originally entered into in 1991 between a Sprint predecessor and WilTel.[8] The SUSA covered approximately 3,592 miles of fiber routes in the eastern United States and required Sprint to make annual payments exceeding $50 million.[9] The agreement governed the operation, servicing, and maintenance of fiber routes that formed part of an integrated telecommunications network.[10] Between 2002 and 2017, the SUSA was amended multiple times.[11]

Thus, the SUSA sat in the background of Cogent and Sprint's negotiation.

---

[5]   *Id*. Ex. Q, Art. II [hereinafter "MIPA"].

[6]   *Id*. ¶¶ 7–8.

[7]   *Id*.; MIPA at 12; § 2.3.

[8]   Amend. Compl. ¶¶ 26, 63, 75; Amend. Compl. Ex. A [hereinafter "SUSA"].

[9]   Amend. Compl. ¶¶ 26, 75.

[10]   *Id*. ¶¶ 34–37.

[11]   *Id*. ¶¶ 47, 49, 51, 56, 65, 70.

The parties eventually closed, with Cogent paying a dollar.[12] Then it came time for the purchase price adjustment.

Cogent submitted its purchase price adjustment report under Article II of the MIPA, itemizing the SUSA under the STOL.[13] Sprint disagreed that the discount applied.[14] Sprint argued that the SUSA was a servicing agreement for owned fiber, meaning it wasn't a lease and, in turn, wasn't subject to the STOL.[15] Still, Cogent reasoned that the STOL was applicable.[16] According to Cogent, Sprint represented in the MIPA (and other diligence materials) before closing that the SUSA was an operating lease obligation subject to the STOL reimbursement, but sought to recharacterize the SUSA as owned fiber so as to avoid the roughly $24 million liability it had agreed to bear under the MIPA.[17]

The dispute was submitted to an independent accounting firm, BDO USA, P.C.[18] Sprint won.[19] BDO excluded the SUSA payments from the STOL calculation and reduced Cogent's STOL amount by $24,195,122, resulting in a corresponding

---

[12] *Id.* ¶ 2; MIPA § 2.2.

[13] Amend. Compl. ¶ 175; Ex. S.

[14] Amend. Compl. ¶¶ 174–01.

[15] *Id.* ¶¶ 174–184. The purchased fiber rights consisted of both owned and leased fiber. *Id.* ¶ 2.

[16] *Id.* ¶¶ 174–84.

[17] *Id.*

[18] *Id.* ¶¶ 184–01.

[19] *Id.* ¶¶ 174–01; Amend. Compl. Ex. T.

increase to the final purchase price paid by Cogent.[20] Cogent didn't agree with that outcome.

Following BDO's determination, Cogent filed this action that included (1) its claim for a reduction of price for the SUSA and (2) other line items for which it believes it should be indemnified.[21] Those line items include unpaid vendor amounts and an unpaid price adjustment on a contract between the purchased companies and Conrail Railroad for a certain right of way.[22] After various filings, Cogent amended its Verified Complaint, and subsequently, Sprint filed a motion to dismiss.[23]

## II. PARTIES' CONTENTIONS

### A. COGENT'S CLAIMS

Cogent brings three claims.[24] In Count I (Fraudulent Inducement), Cogent argues that Sprint knowingly made false representations in MIPA Sections 4.6(b), 4.7(c), and 4.8(a) and the related disclosure schedules by representing that approximately 3,592 miles of fiber governed by the SUSA were leased pursuant to an indefeasible right of use, but asserting after closing that the fiber was owned in

---

[20] Amend. Compl. ¶¶ 174–01.

[21] *See generally* Verified Compl. (D.I. 1).

[22] Amend. Compl. ¶¶ 212–224.

[23] Amend. Compl.; Defs.' Op. Br. (D.I. 28).

[24] *See generally* Amend. Compl.

order to avoid paying $24,195,122 under the STOL.[25]  In Count II (Breach of Contract—Representations and Warranties), Cogent contends the same alleged misrepresentations constitute a breach of contract and further argues that Sprint's failure to disclose $2,345,922.22 in unpaid vendor balances and $2,605,721.10 in accrued Consumer Price Index increases under a Conrail Railway right-of-way agreement breached its representations and warranties in Section 4 of the MIPA.[26] In Count III (Breach of Contract—Indemnification), Cogent argues that Sprint failed to indemnify it for these alleged breaches.[27]

### B. SPRINT'S MOTION TO DISMISS

Sprint contends that Cogent's Amended Complaint is barred and legally deficient for three reasons.[28]  First, Sprint says the contract itself bars Cogent's claims.[29]  Under the MIPA, if the calculation of the STOL was contested, then the correct procedure was to submit the disagreement to an independent accounting firm for final and binding arbitration.[30]  It was; Sprint won.[31]  BDO conclusively determined that Sprint properly accounted for the SUSA as a service contract in

---

[25] *See generally id*. ¶¶ 225–237.

[26] *See generally id*. ¶¶ 235–240 (reiterating claims from its Count I fraud claim).

[27] *See generally id*. ¶¶ 241–249.

[28] *See generally* Defs.' Op. Br.; Reply Br.

[29] Defs.' Op. Br. 14–19; Reply Br. 4–9.

[30] Defs.' Op. Br. 14–19; Reply Br. 4–9; *see* MIPA § 2.3.

[31] Defs.' Op. Br. 14–19; Reply Br. 4–9; Amend. Compl. Ex. T.

Exhibit B to the MIPA and that such treatment complied with Generally Accepted Accounting Principles (GAAP).[32] Beyond that alone, Sprint further asserts that MIPA Section 11.3(f) independently bars recovery because the disputed SUSA amount was "taken into account" in the purchase price adjustment process.[33] Second, Sprint posits that Cogent's fraud claim isn't alleged with particularity and is impermissibly duplicative of Cogent's breach-of-contract claims.[34] Third, Sprint insists that the breach-of-contract claims are not reasonably conceivable under this Court's 12(b)(6) standard[35] as Cogent does not allege any reasonably conceivable false representation, undisclosed material liability, or damages exceeding the contractual indemnity threshold concerning the SUSA-related representations, past-due vendor balances, and undisclosed Conrail Railway liabilities.[36] Therefore, in Sprint's view, the Amended Complaint should be dismissed in its entirety.[37]

---

[32] Defs.' Op. Br. 14–16; Reply Br. 4–9.

[33] Defs.' Op. Br.19–22; Reply Br.11–14; *see* MIPA § 11.3(f).

[34] Defs.' Op. Br. 22–34 n.11; Reply Br. 9–11; 15–26.

[35] *See generally* Defs.' Op. Br.; Reply Br.

[36] Defs.' Op. Br. 23–27, 34–38; *see generally* Reply Br.

[37] *See generally* Defs.' Op. Br.; Reply Br. 27–31.

### III. STANDARD OF REVIEW[38]

Under Rule 12(b)(6), "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[39] Under the well-settled Rule 12(b)(6) standard, the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[40]

The Court does not, however, "accept as true conclusory allegations without any specific supporting factual allegations."[41]

---

[38] All Delaware courts treat decisions under this and the Superior Court's respective Rules 12(b)(6) interchangeably. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (a Court of Chancery appeal quoting the Rule 12(b)(6) standard articulated in *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002), a Superior Court appeal); *see also CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *9 n.65 (Del. Ch. Jun. 29, 2020) (explaining that there is no substantive difference between the two Courts' rules nor any operative difference in the analyses engaged under them to decide a Rule 12(b)(6) motion to dismiss).

[39] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011); *Windsor I, LLC v. CW Capital Asset Mgmt. LLC*, 238 A.3d 863, 871−72 (Del. 2020) (quoting *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d at 168) ("The grant of a motion to dismiss is only appropriate when the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"); *see also Cent. Mortg. Co.,* 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'").

[40] *Cent. Mortg. Co.*, 27 A.3d at 535.

[41] *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d at 168 (internal quotes omitted).

## IV. DISCUSSION

The Court proceeds in three steps. *First*, it addresses Sprint's threshold argument that the MIPA itself bars this action. It doesn't. *Second*, the Court considers whether the fraud claim is impermissibly duplicative of the contract claims. It is. *Third*, the Court turns to the breach-of-contract claims. The Court finds that Cogent has pleaded reasonably conceivable breaches concerning the SUSA-related representations, past-due vendor balances, and undisclosed Conrail Railway liabilities, such that dismissal of the contract and indemnification claims is unwarranted. Therefore, the Court **GRANTS** Sprint's motion to dismiss Cogent's fraud claim (Count I) but **DENIES** dismissal of the breach-of-contract claims (Counts II–III).

### A. THE MIPA ITSELF DOESN'T DISPOSE OF COGENT'S CLAIMS.

Sprint initially argues that Cogent is barred from pursuing its claims for two independent reasons.[42] Sprint contends that the parties reached a final and binding determination under Section 2.3 of the MIPA via an accounting firm's—BDO's—determination, which precludes Cogent from relitigating the purchase price under breach-of-contract or fraud theories.[43] And Sprint also maintains that MIPA Section 11.3 expressly provides that all price determinations made pursuant to Article II are

---

[42]   Defs.' Op. Br. 14–22.

[43]   *Id*. at 14–18.

final and binding, thereby independently foreclosing Cogent's claims.[44]

Because both arguments turn on the proper interpretation of the MIPA—specifically, whether the agreement forecloses Cogent from asserting claims against Sprint—the Court begins its analysis by setting forth Delaware's principles of contract interpretation.

In interpreting contractual language, a Delaware court begins with the written instrument itself[45] and follows the "objective theory of contracts," which requires interpreting a contract as it would be understood by an objective, reasonable third party.[46] The parties' intentions as expressed in the contract itself are what govern, and "Delaware courts will not destroy or twist contract language under the guise of construing it."[47] That intent is reflected by the specific words and clauses the parties selected.[48] "Contractual interpretation operates under the assumption that the parties

---

[44] Defs.' Op. Br. 19–22.

[45] *Gunderson v. Trade Desk, Inc.*, 326 A.3d 1264, 1280 (Del. Ch. 2024) (quoting *SeaWorld Entm't, Inc. v. Andrews*, 2023 WL 3563047, at *3 (Del. Ch. May 19, 2023)) ("Delaware courts start with the text. And if the text is unambiguous, Delaware courts end there too.").

[46] *Vinton v. Grayson*, 189 A.3d 695, 704 (Del. Super. Ct. 2018); *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch. 2022); *Seaford Golf & Country Club v. E.I. duPont de Nemours & Co.*, 925 A.2d 1255, 1260 n.7 (Del. 2007).

[47] *Am. Healthcare Admin. Servs.*, 285 A.3d at 475 (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)) (cleaned up).

[48] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.").

never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."[49]

Applying those principles here, the MIPA does not, by its own terms, dispose of Cogent's claims. First, the purchase price adjustment mechanism in Section 2.3 is properly construed as an expert-determination—not an arbitration provision—and therefore doesn't preclude Cogent from later asserting independent claims for breach of contract or fraud. Second, Section 11.3(f)'s prohibition on duplicative recovery bars indemnification only for amounts that were "actually" taken into account in calculating the final Purchase Price. Because the disputed SUSA amount was expressly excluded from the Purchase Price determination, Section 11.3(f) does not foreclose Cogent's claims as a matter of contract.

1. **MIPA Section 2.3(c) is an "expert determination" provision, not an arbitration provision, and thus, the prior determination by BDO doesn't resolve this dispute.**

Sprint argues that Cogent's claims are contractually barred because the parties already submitted the dispute to binding arbitration.[50] As a general matter, a valid arbitration award precludes a court from relitigating matters that the arbitrator had authority to decide.[51] Delaware law likewise affords contracting parties broad

---

[49] *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) (citing *Majkowski v. American Imaging Mgmt. Serv.,* 913 A.2d 572, 588 (Del. Ch. 2006)).

[50] Defs.' Op. Br. 14–18.

[51] *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155–56 (Del. 2002); *ArchKey*

- 10 -

freedom to structure their chosen method of dispute resolution, not only for arbitration—but for narrower issues and resulting narrower effect.[52] Ultimately, a decision has preclusive effect only to the extent the parties empowered the decisionmaker to adjudicate the issues presented.[53] And accordingly, the Contract cannot foreclose claims beyond the scope of the authority the contract conferred.[54] At this stage, the Court must determine both the authority the parties delegated to the third party and whether that authority encompassed the claims Sprint contends have already been resolved.[55]

Alternative dispute resolution mechanisms can be viewed as existing along a

---

*Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 990 (Del. Ch. 2023); *Dresser Indus., Inc. v. Glob. Indus. Techs. Inc.*, 1999 WL 413401, at *4 (Del. Ch. June 9, 1999) (quoting *McMahon v. New Castle Associates*, 532 A.2d 601, 603 (Del. Ch. 1987)) ("Yet, this court will not 'accept jurisdiction over' claims that are properly committed to arbitration since in such circumstances arbitration is an adequate legal remedy.").

[52] "When parties to an agreement decide that they will submit their claims to arbitration, Delaware courts strive to honor the reasonable expectations of the parties and ordinarily resolve any doubt as to arbitrability in favor of arbitration. Nevertheless, arbitration is a mechanism of dispute resolution created by contract. An arbitration clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement." *Parfi Holding AB*, 817 A.2d at 155–56 (internal citations omitted); *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 454 (Del. Ch. 2018).

[53] *Parfi Holding AB*, 817 A.2d at 156.

[54] *Id*. at 155 ("When the arbitrability of a claim is disputed, the court is faced with two issues. First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance. This is a case of first impression in Delaware.").

[55] *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 993 (Del. Ch. 2023).

spectrum.[56] At one end is arbitration. Although arbitration need not mirror judicial proceedings, arbitrators generally possess adjudicative authority comparable to that exercised by courts, including the power to resolve legal and factual disputes and render binding awards.[57] Consequently, arbitration awards ordinarily preclude subsequent litigation of matters within the arbitrator's authority.[58] "At the other end of the ADR spectrum is an expert determination, which provides parties with a quick and relatively inexpensive answer on an issue that calls for informed judgment."[59] Unlike an arbitrator, an expert's authority is confined to deciding specific matters entrusted to the expert under the parties' agreement, and any preclusive effect extends no further than those delegated issues.[60]

That distinction isn't always clear, but our Supreme Court has lent guidance in *Terrell v. Kiromic Biopharma, Inc.*[61] as to what Delaware's courts call the

---

[56] *Id.* at 989.

[57] They may "select someone other than a legal professional to act as arbitrator, limit the scope of the arbitrator's authority, or craft special rules to govern a given dispute." *Id.* at 990.

[58] *Mehiel v. Solo Cup Co.*, 2007 WL 901637, at *5 (Del. Super. Ct. Mar. 26, 2007) ("[V]alid and final arbitration awards are given the same effect as a court's judgment under the doctrine of *res judicata.*") (internal citation omitted).

[59] *ArchKey*, 302 A.3d at 990; *see also Driven Intermediate Holdings, Inc. v. Jimenez,* 2026 WL 892029, at *4 (Del. Ch. Mar. 31, 2026).

[60] "Unlike an arbitrator who has broad authority to decide all legal and factual issues necessary to resolve a controversy and award a remedy, an expert has limited authority to decide 'a specific factual dispute concerning a matter within [their] special expertise[.]'" *Driven Intermediate Holdings,* 2026 WL 892029, at *4 (quoting *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 618 (Del. 2023)).

[61] 297 A.3d 610, 618 (Del. 2023) (quoting N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues,*

"authority test."[62] Where a provision contemplates a formal adjudicative process—with procedural safeguards, authority to resolve legal and factual disputes, and power to award relief—the provision functions as arbitration.[63] Where, by contrast, the decisionmaker's mandate is narrow and limited to resolving a discrete issue within a defined subject matter, the provision is properly construed as an expert determination.[64] "An expert is not making decisions 'on issues of law or legal claims.'"[65]

*Practical Problems and Suggested Improvements* (2013)). The Supreme Court explicitly follows the guidance provided by the New York Bar Commission on International Commercial Arbitration when interpreting the difference between arbitration and an expert determination in a contract. *Id.* That guidance states that the difference ultimately comes down to the power granted to the entity making the decision. *Id.*; *AM Buyer LLC v. Argosy Inv. Partners IV, L.P.*, 2024 WL 4024980, at *8 (Del. Super. Ct. Sept. 3, 2024) ("Delaware courts have applied the 'authority test' to determine whether parties have opted for arbitration.").

[62] *Pazos v. AdaptHealth LLC*, 322 A.3d 492, 501 (Del. Super. Ct. 2024), *aff'd*, 340 A.3d 543 (Del. 2025); *AM Buyer*, 2024 WL 4024980, at *8; *ArchKey*, 302 A.3d at 994.

[63] *Terrell*, 297 A.3d at 618 (quoting N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013)) ("The grant of authority to an arbitrator, but not an expert, is analogous to the powers of a judge in a judicial proceeding. [The arbitrator has the ability] to rule on legal claims, legal causes of action and to award a legal remedy, such as damages or injunctive relief."); *Pazos*, 322 A.3d at 499–502.

[64] *Terrell*, 297 A.3d at 618 (quoting N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013)) ("[T]he authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation. The decision maker's authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact."); *Pazos*, 322 A.3d at 499–502.

[65] *AM Buyer*, 2024 WL 4024980, at *12 (quoting *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 464 (Del. Ch. 2018)); *see also Penton Bus. Media Holdings*, 252 A.3d at 466 ("Although Delaware cases have not expressly adopted a default rule for use when the agreement is silent, the logic of the decisions suggests that an expert charged with making a narrow determination will not have authority to interpret the governing agreement unless the contract says

Most typically the expert determination is "an issue of valuation."[66] And frankly, "[t]he first clue [of finding an expert determination] is that the decision maker is an Independent Accountant. That choice strongly suggests an intent to rely on the Independent Accountant's subject matter expertise, which is . . . inconsistent with legal arbitration."[67] "A second clue is the absence of any reference to a set of procedural rules[.]"[68] And "[a] third clue is the nature of the parties' submissions and the absence of a hearing."[69]

This case falls squarely into the latter category. MIPA Section 2.3(c) provides, in relevant part:

> . . . The Dispute Notice shall (x) only include disagreements (and proposed changes to the Buyer's Report may only be) based on (A) a failure of any of the Closing Net Working Capital, the Closing Cash, the Closing Indebtedness, the Closing Unpaid Transaction Expenses, the Short-Term Operating Lease Payment and the resulting Purchase Price set forth in the Buyer's Report to be determined in accordance with the applicable definitions of this Agreement and/or the Accounting Principles or (B) mathematical errors in the Buyer's Report and (y) set forth the

so.").

[66] *Terrell*, 297 A.3d at 618 (quoting N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013)); *see generally ArchKey*, 302 A.3d 975; *Pazos*, 322 A.3d at 499–502.

[67] *ArchKey*, 302 A.3d at 996 (discussing that the first clue, in that case, was the independent accountant themselves, the second being the absence of any procedural rules, and the third was the nature of the submissions of the parties in the absence of a formal hearing); *AM Buyer*, 2024 WL 4024980, at *8 n.96.

[68] *ArchKey*, 302 A.3d at 996.

[69] *Id*.

basis for the dispute of any such calculation in reasonable detail. . . . The scope of disputes to be resolved by the Accounting Firm shall be limited to whether the items in dispute that were included in the Dispute Notice were determined in accordance with the applicable definitions of this Agreement and/or the Accounting Principles and whether there were any mathematical errors in the calculations thereof, and the Accounting Firm shall determine, on such basis, to what extent the Purchase Price set forth in the Buyer's Report requires adjustment. . . .[70]

Here, the accounting firm's role is to make an expert determination. It resolves the dispute solely by reviewing the Dispute Notice and only to the extent the objections assert noncompliance with the Agreement's definitions, the Accounting Principles, or the existence of mathematical errors.[71] There is little to no arbitration-like process. The firm's only task is confined to determining whether the specific disputed calculations were made in accordance with the definitions as written and whether the arithmetic was correct and subsequently adjusting the purchase price only as those determinations require. By its terms, the mechanism is an accounting-error resolution process that presupposes, rather than reexamines, the Agreement's substantive terms.[72] The provision doesn't authorize the accounting

---

[70] MIPA § 2.3(c).

[71] *Compare* MIPA § 2.3(c) *with Pazos*, 322 A.3d at 499–502 (finding decision-maker's authority was limited solely to resolving cost adjustment disputes); *ArchKey*, 302 A.3d at 992–97 (discussing "Accountant True-Up Mechanism[s]").

[72] While the decision in *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.* came before the Supreme Court had explained the "authority test" in *Terrell*, the following quote is still instructive. "[W]hen parties call for an expert determination, they are generally not 'grant[ing] the expert the authority to make binding decisions on general issues of law or legal disputes[.]'" 2019 WL 366614, at *7 (Del. Ch. Jan. 29, 2019) (quoting *Penton Bus. Media Holdings*, 252 A.3d at 466)

- 15 -

firm to interpret terms, to look behind the contractual definitions, or to recharacterize what was conveyed as a result of a breach of contract or misrepresentation of a term.[73] There's no procedural mechanism to do so.[74] The only function that clause elucidates is a limited delegation to an accounting expert to apply agreed-upon definitions to correct any mathematical mistakes.

BDO's accounting determination is not dispositive of broader legal claims; though, it may be binding pending the resolution of this case.[75] The Court cannot and will not defer to BDO's conclusion on matters it had no right to determine under the MIPA. Accordingly, the Court is not precluded from hearing the claims brought here.

### 2. Cogent's claims are not barred by Section 11.3(f) of the MIPA.

Next, Sprint insists that the MIPA bars Cogent from recasting a rejected purchase price adjustment as an indemnification claim.[76] Sprint argues that Section 11.3(f) excludes from indemnifiable "Losses" any amounts that were taken into account in calculating the final Purchase Price, making Section 2.3's adjustment

---

(cleaned up).

[73] *See ArchKey*, 302 A.3d at 996.

[74] *See id.*

[75] If the Court agrees with Sprint's characterization of the SUSA, then BDO's findings would appear to resolve the purchase-price adjustment. Because the parties have not fully briefed that issue, however, the Court reserves it for decision at a later date, if and when it becomes applicable.

[76] Defs.' Op. Br. 19–22.

process the exclusive mechanism for resolving such disputes.[77]  So, in Sprint's view, because BDO expressly considered and rejected Cogent's attempt to include the $24,195,122 SUSA amount in the STOL—thereby taking that amount into account in determining the final Purchase Price—Cogent cannot recover the same sum as indemnification.[78]

Sprint's interpretation is at odds with the contract itself.  MIPA Section 11.3(f) reads in full:

> For the avoidance of doubt, any Losses shall be determined without duplication of recovery due to the facts giving rise to such Losses constituting a breach of more than one representation, warranty, covenant or agreement, and **any amount taken into account in calculating the Purchase Price** (or any of the components thereof), including the Estimated Purchase Price and the Final Purchase Price, **shall not be included in determining the amount of any Losses only to the extent such amounts were actually taken into account in determining the Purchase Price** (or any of the components thereof).[79]

Read plainly, Section 11.3(f) is a non-duplication provision that prevents double recovery by excluding from indemnifiable Losses amounts already reflected in the Purchase Price.  And the provision applies only "to the extent such amounts were actually taken into account in determining the Purchase Price."[80]  That

---

[77]  *Id.*

[78]  *Id.*

[79]  MIPA § 11.3(f) (emphasis added).

[80]  *Id.*

limitation ensures that a buyer cannot recover the same economic loss twice through the purchase price and through indemnification.

But Sprint seeks a broader reading of the provision, suggesting that because the SUSA was raised and rejected during the purchase price adjustment phase, it was necessarily "taken into account" and therefore barred from indemnification.[81] But the text doesn't equate consideration with inclusion: the provision excludes only amounts "actually"[82] reflected in the Purchase Price, not amounts proposed and rejected during the adjustment process.[83] Reading otherwise would substantially alter its terms.[84]

---

[81] Defs.' Op. Br. 19–22.

[82] MIPA § 11.3(f) (emphasis added); *Actually*, FOWLER'S MODERN ENGLISH USAGE 19 (3rd ed. 2004) (". . . to mean 'in fact, in reality'"—including such examples as assertions, adding emphasis, and reinforcing statements).

[83] This issue is somewhat analogous to *N. Data AG v. Riot Platforms, Inc.*, 2025 WL 1661855 (Del. Ch. June 2, 2025). There, this Court made clear that a price adjustment and the representations and warranties are two "tracks [that] have distinct functions" and cannot be collapsed into the same. *Id.* at *12. The purchase price adjustments are meant to address "'changes in a target's business between the signing and closing,'" while indemnification is the remedy for breaches of representations and warranties. *Id.* Permitting parties to reroute indemnity disputes through the accounting process would render one or both meaningless. *Id.* at *14 (quoting *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 932 (Del. 2017)) ("render[ ] the [indemnification cap] meaningless and eviscerate[ ] the basic bargain between two sophisticated parties.") (omissions in original).

[84] Reading Section 11.3(f) to bar indemnification whenever an item was merely raised and rejected would eviscerate the indemnification regime and render other provisions superfluous, contrary to the parties' bargained-for allocation of risk. *NAMA Holdings*, 948 A.2d at 419. For example, MIPA § 11.2 permits indemnification for Losses "[f]rom and after the Closing" for "any breach of or any inaccuracy in any representation or warranty of Seller or the Company[.]" Under Sprint's reading of § 11.3, that protection would largely terminate once the purchase price adjustment was completed, because many representations necessarily inform the calculation of the Purchase Price and thus would be deemed "taken into account" in that process. Section 11.3 cannot be read to so drastically curtail the post-Closing indemnification regime.

And given that the SUSA amount wasn't "actually taken into account"[85] in determining the Purchase Price, double recovery can't result. Absent any inclusion of the SUSA in the Final Purchase Price, Section 11.3(f) doesn't preclude Cogent from pursuing indemnification based on an independent breach or fraud theory. Therefore, these claims are not contractually barred by the MIPA.

### B. COUNT I IS DISMISSED AS DUPLICATIVE OF COUNTS II AND III.

Sprint next challenges Cogent's fraud claim (Count I).[86] Sprint advances two arguments: first, that Cogent's fraud claim is impermissibly duplicative of its breach-of-contract claims under Delaware's anti-bootstrapping rule;[87] and second, that the fraud allegations fail to satisfy Rule 9's particularity requirement.[88] Because the Court agrees that the fraud claim is barred by Delaware's anti-bootstrapping doctrine, it does not reach the Rule 9 issue.

The anti-bootstrapping doctrine prevents parties from "transmut[ing] a breach of contract claim into a fraud" when both seek identical relief.[89] To overcome an anti-bootstrapping determination, the claimant must show separate wrongful

---

[85] *See* MIPA § 11.3(f).

[86] Defs.' Op. Br. 22–34; Reply Br. 15–27.

[87] Defs.' Op. Br. 34 n.11. Defendants only argue anti-bootstrapping in footnote 11 of their Opening Brief but further argue the doctrine in their Reply Brief. Reply Br. 26–27.

[88] Defs.' Op. Br. 22–34; Reply Br. 15–27.

[89] *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020).

conduct or distinct damages.[90]  Delaware limits contractual fraud theories because many are mere repeaters of the underlying breach.[91]  If "[b]oth claims lead to the same destination," then the "remedy should be in contract[.]"[92]  Thus, the focus is on independence, and where that independence is absent, the doctrine applies.[93]  The Court must look to "whether the fraud claim rests on a duty imposed by law that is separate from the parties' contractual obligations, and whether it seeks damages that are qualitatively different from those available for breach of contract."[94]

---

[90]  *ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015); *see Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *26 (Del. Ch. Sept. 18, 2020) (discussing the differences of a contract claim and a tort claim).

[91]  *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at *5 (D. Del. May 24, 2001) ("where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."); *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004); *Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*, 2005 WL 445710, at *3 (Del. Super. Ct. Feb. 23, 2005); *ITW Glob. Invs.*, 2015 WL 3970908, at *6.

[92]  *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020); *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022) (quoting *Pilot Air Freight*, 2020 WL 5588671, at *26) (explaining there are the following exceptions to the rule: "(1) the plaintiff alleges the seller knowingly made false contractual representations, (2) damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim, (3) the conduct occurs prior to the execution of the contract and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction, or (4) the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud claim.") (cleaned up); *see generally ITW Glob. Invs.*, 2015 WL 3970908, at *6.

[93]  *ITW Glob. Invs.*, 2015 WL 3970908, at *6 (quoting *Midland Red Oak Realty*, 2005 WL 445710, at *3) (explaining that the fraud claim must rest on "a violation of an independent duty imposed by law"); *see also Pinkert*, 2001 WL 641737, at *5; *Garber v. Whittaker*, 174 A. 34, 37 (Del. Super. Ct. 1934).

[94]  *WIA Holdings LLC v. Scottish Am. Capital LLC*, 2026 WL 1204494, at *13 (Del. Ch. Jan. 20, 2026); *ITW Glob. Invs.*, 2015 WL 3970908, at *6; *Garber*, 174 A. at 37 (quoting *Stock v. City of Bos.*, 21 N.E. 871, 872 (Mass. 1889)) ("A mere breach of contract cannot be sued on as a tort, but for tortious acts, independent of the contract, a man may be sued in tort, though one of the

Here, the claim fails on both fronts. The alleged misrepresentations that form the basis of Count I's fraud claim are the same misrepresentations that form the basis of Counts II and III's breach-of-contract claim. Under both its fraud theory and its breach-of-contract theories, Cogent argues it is due money as a result of misrepresentations within Sprint's Representations and Warranties in Sections 4.6, 4.7, and 4.8 of the MIPA concerning the Sprint Fibers and the SUSA.[95] The fraud claim does not identify *any additional conduct* beyond Sprint's alleged breaches of the representations and warranties within the contract.[96]

And the alleged fraud damages don't differ from the breach claim. In Count I, Cogent seeks $24,195,122, which it characterizes as the lease payment obligations Sprint was required to make under the MIPA.[97] That is the same measure of damages sought for both Counts II and III.[98] Cogent's fraud claim doesn't seek any further

---

consequences is a breach of his contract.").

[95] *Compare* Amend. Compl. ¶¶ 225–237 (Count I) *with* Amend. Compl. ¶¶ 238–249 (Count II–III).

[96] Amend. Compl. ¶ 231 (referencing MIPA § 4.6(b), 4.7(c), 4.8(a), Cogent wrote "Sprint intentionally made these material misrepresentations, including material omissions, to fraudulently induce Cogent into executing and consummating the MIPA."); *but see EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *5 (Del. Super. Ct. Mar. 13, 2017) (quoting *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010)) ("Nor can a plaintiff devise a claim for fraud simply by adding the term 'fraudulently induced' to a complaint.") (cleaned up).

[97] Amend. Compl. ¶ 237 (discussing its fraud claim, "Cogent has suffered damages equal to $24,195,122 which represents the amount of the lease payment obligation that should have been made by Sprint under the MIPA.").

[98] *Compare* Amend. Compl. ¶ 237 (Count I) *with* Amend. Compl. ¶¶ 240, 247–49 (Counts II and III).

damages, nor does it allege any out-of-pocket reliance damages that would differ from its contractual expectancy.[99]

Cogent claims that Sprint promised one thing, delivered another, and now owes the difference. That is a contract claim. Because Count I rests entirely on contractual duties and seeks the same damages as Cogent's breach-of-contract claims, it lacks the independence required to proceed as a tort. Sprint's motion to dismiss Count I is therefore **GRANTED**.

## C. COGENT'S BREACH-OF-CONTRACT CLAIMS (COUNTS II AND III) ARE REASONABLY CONCEIVABLE.

Sprint argues that Cogent has penned deficient claims for breaches of contract under Counts II and III for both the SUSA issue as well as other line-item claims by Cogent.[100] The Court must, therefore, examine Cogent's breach-of-contract claims under its rule governing pleading sufficiency. To state a claim for breach of contract, a party must allege facts supporting a reasonably conceivable claim that: (1) a contractual obligation existed; (2) the defendant breached that obligation; and (3) the breach caused the plaintiff's damages.[101]

"As a question of law, a contract's proper interpretation can be resolved on a

---

[99] Even if Cogent sought punitive damages, that addition is "not enough to distinguish it from the contract damages." *EZLinks*, 2017 WL 1312209, at *6; *CoVenture - Burt Credit Opportunities GP, LLC v. Coleman*, 2023 WL 7179488, at *9 (Del. Super. Ct. Nov. 1, 2023).

[100] *See generally* Defs. Op. Br.

[101] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

motion to dismiss. But, to achieve dismissal, the motion must be supported by unambiguous contract terms."[102] At the motion to dismiss stage, the Court cannot "inappropriately shift[] the burden" to the plaintiff by requiring "a higher standard than required" to prove a breach—the only question is whether a breach "is provable under any reasonably conceivable set of circumstances."[103]

### 1. Cogent has stated a reasonably conceivable claim for breach of contract and indemnification concerning the SUSA.

Cogent alleges that Sprint breached the MIPA by misrepresenting the nature of the SUSA through three related contractual representations: Section 4.6(b) and its corresponding Schedule's distinction between "owned" and "leased" fiber, the inclusion of the SUSA on Schedule 4.7(c), and the omission of the SUSA from Schedule 4.8.[104] Sprint disputes that any of those provisions represented the legal character of the SUSA.[105] But the parties' competing interpretations need not be resolved now. On a motion to dismiss, the question is only whether Cogent's breach claim is reasonably conceivable.

It is. Cogent alleges that the SUSA concerned fiber that Sprint owned, but

---

[102] *Blue Cube Spinco LLC v. Dow Chem. Co.*, 2021 WL 4453460, at *7 (Del. Super. Ct. Sept. 29, 2021) (citing *VLIW Tech.*, 840 A.2d at 615); *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[103] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 538 (Del. 2011).

[104] *See generally* Amend. Compl.; Pl.'s Answer.

[105] *See generally* Defs.' Op. Br.; Reply Br.

that Sprint represented the SUSA as a lease or similar right-of-use arrangement in the MIPA.[106] That distinction may have mattered because the classification of fiber as "owned" or "leased" affected the STOL and, therefore, the purchase price.[107]

Start with Section 4.6(b). That section represents that Schedule 4.6(b) sets forth a true and correct statement of the Systems' route miles and fiber counts, distinguishing between "owned" and "leased" fiber.[108] Cogent alleges that the SUSA fiber was classified as leased even though Sprint owned it.[109] Sprint responds that the schedule merely provides approximate route mileage and fiber counts and does not represent the ownership or legal character of the underlying fiber.[110]

Drawing all reasonable inferences in Cogent's favor, it is reasonably

---

[106] Amend. Compl. ¶¶ 73–143.

[107] MIPA at 12 ("Short-Term Operating Lease Amount"); *id.* § 2.3.

[108] MIPA § 4.6(b) states:

> Without limiting the foregoing, Schedule 4.6(b) sets forth a true and correct statement, except for de minimis inaccuracies, as of the date of the Agreement of (i) the approximate number of route miles in the Systems and (ii) the approximate fiber count per route in the Systems.

MIPA Schedule 4.6(b) (Amend. Compl. Ex. R) lists:

> (i)  16,843 miles of leased fiber[;] 20,305 miles of owned fiber
>
> (ii) 1,268 fiber count in leased fiber routes[;] 4,056 fiber count in owned fiber routes[.]

[109] Amend. Compl. ¶¶ 144–152.

[110] Defs.' Op. Br. 24–25 ("Section 4.6(b) and its corresponding schedule did not purport to describe in any way Sprint's accounting for the SUSA. Thus, while Cogent reasonably could have relied on Schedule 4.6(b) in forming a belief that there were approximately 37,148 route miles in the Systems, it could not have relied on that Schedule in forming a belief as to whether the SUSA obligations would be part of the STOL amount.").

conceivable that Schedule 4.6(b)'s distinction between "owned" and "leased" fiber communicated more than approximate mileage and quantity. One could reasonably infer those labels carried economic consequences under the MIPA because the treatment of fiber as leased affected the STOL purchase-price reduction.[111] Thus, the classification of the SUSA fiber as leased could be understood as a representation concerning the nature of Sprint's rights in that fiber, not merely as a method of estimating route mileage and fiber counts.

The other contractual provisions identified by Cogent support the same reasonable inference. Section 4.7(c) represents that Schedule 4.7(c) identifies the Company's rights-of-way, easements, indefeasible rights of use, fiber swaps, and similar arrangements.[112] The SUSA appears on that schedule.[113] According to

---

[111] MIPA § 2.3.

[112] MIPA § 4.7(c) states:

> Schedule 4.7(c) lists each right of way, easement, indefeasible right to use (or similar arrangement) or fiber swap (or similar arrangement), the individual loss of which would reasonably be expected to be material to the Business (the 'Other Real Property Agreements' and, together with the Owned Real Property and the Material Real Property Leases, the 'Real Property Interests').

[113] The first item listed on Schedule 4.7(c) is the SUSA, without qualification. Schedule 4.7(c)(1) (Amend. Compl. Ex. R); *cf. Petition of State*, 708 A.2d 983, 988 (Del. 1998) (quoting *Triple C Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 631 (Del. 1993)) ("where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."); *Penton Bus. Media Holdings*, 252 A.3d at 468 (same); *NAMA Holdings*, 948 A.2d at 419 ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").

Cogent, its inclusion suggested that the SUSA gave Sprint a contractual right to use fiber owned by another party, rather than covering fiber Sprint itself owned.[114]

Turn, too, to Section 4.8. That section represents that Schedule 4.8 contains a complete list of Sprint's Material Company Contracts.[115] Cogent alleges that, if the SUSA was a service agreement concerning fiber Sprint owned, it qualified as a Material Company Contract and should have appeared on Schedule 4.8.[116] It did not.[117] Cogent therefore alleges that the omission further suggested that Sprint was treating the SUSA as a lease or similar right-of-use arrangement, rather than as a service contract involving owned fiber.[118]

Read together, these allegations support a reasonably conceivable inference that the MIPA represented the SUSA as a lease or similar arrangement even though

---

[114] Amend. Compl. ¶¶ 153–61.

[115] MIPA § 4.8(a) states:

> Schedule 4.8 sets forth, as of the date hereof, a true, correct and complete list of all of the following Company Contracts (the contracts listed or required to be listed on Schedule 4.8, collectively, the "Material Company Contracts").

See MIPA § 4.8(i)–(xx) ("(i) Company Contracts for which the obligations under such Company Contract involve aggregate payments by the Company and its Subsidiaries in excess of $1,250,000 in any twelve (12)-month period;").

[116] Amend. Compl. ¶¶ 162–73.

[117] Schedule 4.8 (Amend. Compl. Ex. R); *cf. Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014) ("Every misrepresentation, to some extent, involves an omission of the truth"); *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015) (same).

[118] Amend. Compl. ¶¶ 162–73.

Sprint owned the relevant fiber. They also support the inference that this alleged mischaracterization affected the calculation of the STOL and the resulting purchase price.

To be sure, there are other provisions of the MIPA which may support Sprint's position—for example, Sprint points to Exhibit B, and its exclusion of the SUSA from the STOL.[119] But "[w]hen interpreting a contract on a motion to dismiss, 'the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions.'"[120] "Even if the court considers one party's interpretation of a contract to be more reasonable, it is error for the court, on a Rule 12(b)(6) motion, 'to select the 'more reasonable' interpretation as legally controlling.'"[121]

Thus, given the express representations, the inclusion of the SUSA within defined schedules, and the omission of the SUSA from others, Cogent's breach-of-contract and related indemnification claims under Counts II and III clear Rule 12(b)(6)'s conceivability threshold. Accordingly, dismissal is unwarranted.

---

[119] Defs.' Op. Br. 25–26; MIPA, Art. I ("Accounting Principles"); MIPA Ex. B.

[120] *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1143–44 (Del. 2025) (quoting *VLIW Tech.*, 840 A.2d at 615).

[121] *Id.* at 1144 (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1292 (Del. 2007)).

**2. Dismissal is equally unwarranted for the Past-Due Vendor Amounts and Conrail Charges under the breach-of-contract and indemnification claims (Counts II and III).**

Having concluded that the SUSA claim survives dismissal, the Court likewise declines to dismiss the claims relating to the past-due vendor balances and the Conrail CPI adjustments. At argument, Sprint acknowledged that these remaining issues rise or fall with the SUSA claim because the basis for Sprint's motion for dismissal primarily rested on the MIPA's $5 million indemnification threshold—which would prohibit recovery had the SUSA claim not survived.[122] Because the SUSA claim does survive, there would be no bar. Even still, as the issue is already briefed, the Court has reviewed the sufficiency of the pleadings and concludes that both issues are adequately alleged.

Cogent alleges that, at closing, Sprint failed to disclose certain past-due balances owed to vendors, notwithstanding its representations and warranties in the MIPA.[123] Although Sprint argues that the Amended Complaint does not identify the vendor balances with sufficient specificity, the Complaint references the allegedly unpaid obligations and incorporates exhibits identifying the vendors and the amounts at issue.[124] Read together, those allegations provide Sprint with fair notice of the

---

[122] Mot. Dismiss Oral Argument Tr. 212–24, May 26, 2026 (D.I. 38); MIPA § 11.3(b).

[123] Amend. Compl. ¶¶ 162–167, 211–22.

[124] Defs.' Op. Br. 36. Delaware law permits plaintiffs to rely on documents—such as exhibits—integral to their claim to satisfy the pleading burden. *See* Ch. Ct. Civ. R. 7(a)(5), 8; *see also* Super.

claim.[125] To the extent Sprint disputes whether the exhibits support the amounts alleged, that dispute raises factual issues inappropriate for resolution on a motion to dismiss.[126]

Cogent also alleges that Sprint failed to disclose liabilities arising under a right-of-way agreement with Conrail that required annual Consumer Price Index ("CPI") adjustments to recurring payments.[127] According to the Amended Complaint, the required CPI adjustments were not implemented or paid from 2020 through 2023, yet Schedule 4.17 to the MIPA disclosed no corresponding liability or obligation.[128] Sprint contends that no liability existed because Conrail had not yet invoiced for the adjustments, and thus, there is no conceivable breach.[129] Not so. It is reasonably conceivable that Sprint's contractual obligation to implement the CPI increases arose independent of any invoice and, at a minimum, that the undisclosed

---

Ct. Civ. R. 10(c).

[125] While the allegations are bare, they nonetheless clear the low bar imposed by Delaware's notice-pleading standard. *VLIW Tech.*, 840 A.2d at 611 (quoting Ch. Ct. Civ. R. 8(a)) ("In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must only give the defendant fair notice of a claim and is to be liberally construed.").

[126] *Blue Cube Spinco*, 2021 WL 4453460, at *14 ("In some sense, all complained-of damages are 'speculative' until the true amount emerges in discovery and ultimately is set at trial. So that's no reason to dismiss."); *see Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc*., 854 A.2d 121, 140 (Del. Ch. 2004) (allowing the breach-of-contract claim to move to discovery, even though the claim was "vague").

[127] Amend Compl. ¶¶ 214–19.

[128] *Id*.; Schedule 4.17 (Amend. Compl. Ex. R).

[129] Defs.' Op. Br. 36–37; Reply Br. 28–30.

CPI adjustments may have constituted material "obligations" within the meaning of MIPA § 4.17.[130] Accepting the well-pleaded allegations as true, the Conrail claim is sufficiently alleged to survive dismissal.

## V. CONCLUSION

For the foregoing reasons, Sprint's Motion to Dismiss is **GRANTED** as to Count I and **DENIED** as to Counts II and III.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge*

---

[130] Amend. Compl. ¶¶ 211–20. MIPA § 4.17 states in relevant part:

> Except as set forth on Schedule 4.17, none of the Company or any of its Subsidiaries has any material liabilities or obligations that would be required to be reflected in a consolidated balance sheet of the Company and its Subsidiaries prepared in conformity with GAAP . . .

Schedule 4.17 (Amend. Compl. Ex. R); s*ee also Sam I Aggregator LP v. Mars HoldCo Corp.*, 2025 WL 2375279, at *8 (Del. Ch. Aug. 15, 2025); *AssuredPartners of Virginia, LLC v. Sheehan*, 2020 WL 2789706, at *8 (Del. Super. Ct. May 29, 2020).

\* Sitting by designation of the Chief Justice pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Feb. 27, 2025) (FOURTH AMENDED ORDER).